Filed 6/26/13  P. v. Adderley CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B235766 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA036204) |
| v. | |
| DUKWAN WILLIAM ADDERLEY, | |
| Defendant and Appellant. | |
| In re | B240941 |
| DUKWAN WILLIAM ADDERLEY, | |
| on | |
| Habeas Corpus. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Chung, Judge.  Convictions affirmed; sentence vacated and remanded.

PETITION for Writ of Habeas Corpus.  Writ denied.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

Dukwan William Adderley appeals the judgment entered following his conviction by jury of first degree murder committed while Adderley was engaged in the commission of attempted robbery in which a principal was armed with a handgun and attempted robbery. (Pen. Code, §§ 187, 190.2, subd. (a)(17), § 12022, subd. (a)(1), 664/211.) The trial court sentenced Adderley to life without the possibility of parole plus one year in state prison.

In Adderley's first appeal (B217620, filed March 10, 2011), we rejected claims of jury coercion, error in permitting additional argument after the jury indicated it had reached an impasse and insufficiency of the evidence to support the special circumstance allegation. We also concluded *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] was inapplicable because the evidence showed Adderley knew his codefendant, Manard, planned to rob a cab driver before Adderley chose to assist Manard and Adderley put the gun at the driver's head when Manard demanded money. However, we found merit in Adderley's assertion the trial court was unaware of the extent of its sentencing discretion under Penal Code section 190.5, subdivision (b).[1] We remanded the matter to permit the trial court to consider whether to impose a term of 25 years to life, rather than life without the possibility of parole.

On remand, the trial court conducted a sentencing hearing at which it acknowledged its discretion to impose a term of 25 years to life in prison but, after balancing the single mitigating factor, Adderley's youth, against numerous aggravating factors, declined to do so and left the previously imposed term in place.

---

[1]    Penal Code section 190.5, subdivision (b) provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

2

On appeal and by way of petition for writ of habeas corpus, Adderley contends the term of life without the possibility of parole constituted an abuse of the trial court's discretion and defense counsel rendered ineffective assistance at the resentencing hearing in failing to assemble and present mitigating evidence. (See *Wiggins v. Smith* (2003) 539 U.S. 510, 523-527, 535 [156 L.Ed.2d 471]; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 [80 L.Ed.2d 674]; *In re Marquez* (1992) 1 Cal.4th 584, 607.) Adderley attaches to his writ petition letters from his family insurance broker, a former employer, a family friend, Adderley's sister-in-law and his mother all attesting to his good character.

In a supplemental opening brief, Adderley contends the matter must be remanded for resentencing under *Miller v. Alabama* (2012) ___ U.S. ___, 132 S.Ct. 2455 [183 L.Ed.2d 407], which established a term of life without the possibility of parole should be uncommon for a juvenile offender and, before imposing such a term, the trial court must consider numerous factors that were not addressed in Adderley's case.

We agree *Miller* significantly altered the landscape for sentencing juvenile offenders eligible for life without the possibility of parole. Because neither the trial court nor defense counsel had the benefit of *Miller*, we remand to permit the trial court to resentence Adderley having in mind the factors noted in *Miller* and to give defense counsel an opportunity to present evidence relating to these factors. We express no opinion regarding how the trial court should exercise its discretion. This resolution renders Adderley's ineffective assistance of counsel argument moot and his abuse of discretion argument premature.[2] We therefore deny the petition for writ of habeas corpus but remand for resentencing.

---

[2] Adderley also contends the sentence of life without the possibility of parole should be vacated under *Graham v. Florida* because he was a juvenile when he participated in the robbery and did not kill, intend to kill or foresee life would be taken. We rejected this claim in Adderley's first appeal.

Adderley further claims that, under *Miller* there must be a jury finding as to whether a juvenile defendant, convicted of as an aider and abettor, actually killed or

## FACTS AND PROCEDURAL BACKGROUND

1. *The underlying offense.*

On April 15, 2006, Marvin Ramsey was at the home of Rochelle Newman in Lancaster with 16-year-old Adderley and 25-year-old Jamar Manard. After they left Newman's home, Manard telephoned a taxi company and requested a cab at Manard's mother's former address on 12th Street East, which was approximately three blocks from Newman's home. Manard said, "We're going to rob" the cab driver and asked if Adderley and Ramsey wanted to go. Adderley was "iffy about it" but Ramsey said no and told Adderley and Manard not to do it. Manard said, "I'm going with or without you guys." Manard crossed the street and started walking in the direction of his former residence. Adderley eventually made "googly eyes" and crossed the street to join Manard. Ramsey recalled either Manard or Adderley had a handgun that evening. Manard did not threaten Ramsey to become involved in the robbery or call him a coward for not participating. After Manard and Adderley left, Ramsey returned to Newman's home.

At approximately 9:00 p.m., Jesse Pulido was seated in a parked car on Fenhold Street. Pulido heard a pop followed by tires squealing. Pulido then saw a taxicab crash into a parked car. Two males exited the back seat of the cab, one from each side, and ran from the scene. Edward Sweatt, the driver of the cab, was slumped over the driver's seat with a fatal gunshot wound to the head.

Later that evening, Manard telephoned Ramsey and said, "We killed a taxi man." Manard subsequently arrived at Newman's home, followed by Adderley about 30 minutes later. Before Adderley arrived, Manard said they were in the back seat of the cab and had driven no more than three blocks when Adderley produced the gun. The cab driver "put the pedal to the metal" and said, "We're all going to die tonight." Adderley then "froze or something" and Manard told Adderley, "Go on, do it. Do it." Ramsey did not remember if Manard said he put his finger on the trigger or not, but he said he

intended to kill before a court can sentence him to life without the possibility of parole or its functional equivalent. However, nothing in *Miller* suggests this result.

4

grabbed the gun with Adderley and "they [both] shot him." When Adderley arrived at Newman's residence, Manard said Adderley killed the cab driver. Adderley did not object to this statement. In fact, later that night Adderley said, "I did it."

James Scott testified that in August of 2006 he agreed to cooperate in Adderley's case in order to obtain a reduced sentence in a firearm case. In 2006, Scott had a conversation with Adderley, whom he loved like a brother, about a taxicab robbery. Adderley said he and Manard got into a cab Manard had called. Manard went into a house and returned with a gun which he gave Adderley. When they started moving, Manard demanded the cab driver's money. Adderley had the gun "maybe just trying to scare the taxi man to give him the money. Then I guess the taxi man said, 'no, we're all about to die tonight,' and pushed on the gas." Manard told Adderley to kill the driver but Adderley "froze up." Manard then "put his hands around the gun and pulled the trigger."

2. *The first sentencing hearing.*

At sentencing, relatives of the victim, Adderley's mother and Adderley addressed the trial court. The trial court then indicated it intended to impose "the term that's mandated and prescribed per the law" and sentenced Adderley to life without the possibility of parole on count one, murder. The trial court added a consecutive one-year term under Penal Code section 12022, subdivision (a)(1) and stayed the term imposed on count two, attempted robbery.

3. *The second sentencing hearing.*

As indicated above, in B217620, we remanded the matter to permit the trial court to consider imposition of a term of 25 years to life in the exercise of its discretion. (Pen. Code, § 190.5, subd. (b).) On August 9, 2011, the trial court appointed Michael Morse to represent Adderley. The trial court indicated it assumed Morse "would like time to get familiar with this [case and] with Mr. Adderley." The trial court continued the matter and indicated Morse could speak with Adderley for "a few moments . . . in the interview room."

5

Adderley returned to court with Morse on September 2, 2011. The trial court indicated the matter had been remanded to allow counsel to argue the trial court should impose a term of 25 years to life in the exercise of its discretion.

Morse thereafter argued Adderley "was 16 years old when this happened. In talking to [the prosecutor], my understanding is it is unclear as to who the shooter was, although the probation report indicates [Manard] was the shooter and – but I would say this. The Supreme Court backed off the death penalty for juveniles, and I think they look at juveniles as a special situation. [¶] He was only 16 years old when this happened. He does not have an extensive prior juvenile record. . . . We don't know definitively that he was the shooter. It looks like he may not have been the shooter. The report indicates that he is the one who brought the gun to the taxi. But given his age and minimal background, certainly a life with parole sentence is very substantial. The likelihood of being paroled is not very good anyway. But I think that a person of his age ought to have at least the opportunity of . . . maybe getting parole."

The prosecutor agreed "there was no clear indication" in either Adderley's or Manard's trial as to "who the shooter was" and acknowledged Adderley had a "limited prior history" consisting of a burglary and theft-related offenses. However, a sentence of life without the possibility of parole was appropriate because Adderley brought the gun to the scene.

The trial court indicated it had reviewed the record and its notes, and stated it had presided over the separate jury trials of Adderley and Manard. The trial court indicated that, in balancing the factors relevant to the exercise of its discretion, "in terms of mitigation[,]" Adderley was "very young" at the time of the offense. The trial court "believe[d] Mr. Manard might have testified that Mr. Adderley was the one that actually shot, but . . . no definitive evidence" corroborated Manard's testimony. Thus, the trial court would "give [Adderley] the benefit of the doubt that he may very well have not done the actual shooting."

However, the victim was "vulnerable in the sense that there was absolutely no provocation." Also, the offense was "somewhat [of] a sophisticated crime" "in that it was [committed] in concert" with Manard. The trial court noted a "clear escalation" in the seriousness of Adderley's offenses, which included a sustained delinquency petition for burglary committed approximately one year before the instant offense. The trial court stated Adderley "had the benefit of rehabilitation at the juvenile level," and was placed home on probation under a deferred entry of judgment program. However, he failed to appear "after being given the benefit of probation" and a bench warrant for his arrest issued.

The trial court indicated it had considered the term to be imposed under recent cases addressing the imposition of a term of life without the possibility of parole for a juvenile and noted these cases all had arisen in "a non-homicide context." The trial court concluded Adderley's youth was a mitigating factor but found the aggravating factors preponderated. "[C]onsidering the objective[s] of . . . protection of the community and public safety," the trial court "decline[d] to exercise its discretion" and ordered the previously imposed term to remain in effect.

4. *Appointed appellate counsel's declaration filed in support of the petition for writ of habeas corpus.*

Appointed appellate counsel declared that, after the opinion in B217620 was filed, counsel advised Adderley's mother to assemble letters attesting to Adderley's good character. Adderley thereafter advised appointed appellate counsel that Michael Morse, the attorney appointed to represent him in the trial court, met with him only once in the courtroom lockup and told Adderley he could not present character evidence. Appointed appellate counsel contacted Morse and asked why he did not seek a continuance to meet with Adderley, review the trial transcripts, contact Adderley's mother or assemble favorable information. Morse responded he determined these actions were unnecessary because the trial court indicated it would not sentence Adderley to any term other than life without the possibility of parole. When appointed appellate counsel asked Morse to sign a declaration so stating, Morse refused and hung up.

7

## DISCUSSION

After the resentencing hearing in Adderley's case, the United States Supreme Court decided *Miller v. Alabama, supra,* ___ U.S. ___ [132 S.Ct. 2455]. *Miller* held the Eighth Amendment forbids the mandatory imposition of life without the possibility of parole for juveniles convicted of murder. (*Id.* at p. 2469.) *Miller* explained: "[I]n imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id.* at p. 2468.)

Referencing its prior discussions of juveniles' diminished culpability and heightened capacity for change in decisions barring capital sentences for minors (*Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1) and life without the possibility of parole for minors who commit nonhomicide offenses (*Graham v. Florida, supra,* 560 U.S. ___ [176 L.Ed.2d 825]), *Miller* predicted "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability

8

to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller v. Alabama, supra,* ___ U.S. at p. ___ [132 S.Ct. at p. 2469].) The court emphasized its decision "does not categorically bar a penalty for a class of offenders or type of crime . . . . *Instead, it mandates only that a sentencer follow a certain process – considering an offender's youth and attendant characteristics – before imposing a particular penalty.*" (*Id.* at p. 2471, italics added.)

*People v. Caballero* (2012) 55 Cal.4th 262, extended the *Graham* prohibition to any sentence for a nonhomicide offense with a parole eligibility date that falls outside a juvenile offender's life expectancy. (*Id.* at pp. 268-269.) It also concluded "the state may not deprive [juveniles] at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Id.* at p. 268.) In addition, it laid out specific mitigating circumstances that must be considered by a sentencing court before determining at what point a juvenile can seek parole, including their age, whether they were a direct perpetrator or an aider and abettor, and their physical and mental development. (*Ibid.*)

Penal Code section 190.5 does not mandate a term of life without the possibility of parole for juvenile offenders. It therefore is not unconstitutional on its face under *Miller*. (See *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 166.) However, the trial court's statement of reasons followed the sentencing pattern contemplated for an adult in that the sole mitigating factor of Adderley's youth was balanced against the aggravating factors, the vulnerability of the victim, the sophistication of the crime in that it was committed in concert, the increasing seriousness of Adderley's convictions and his failure on a previous grant of probation. The trial court also noted the sentencing objective of public safety in declining to exercise its discretion. Thus, although Adderley's youth was acknowledged as a mitigating factor, it was not accorded the gravity to which it is entitled after *Miller*.

Further, it appears the trial court conducted the hearing in conformance with pre-*Miller* case law which holds the presumptive term under section 190.5, subdivision (b) is life without the possibility of parole. (See *People v. Murray* (2012) 203 Cal.App.4th 277, 282; *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141-1142; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089.)[3] The trial court repeatedly indicated the matter had been remanded to permit it to exercise its discretion and to allow defense counsel to convince the trial court to impose the lesser sentence.

Given these circumstances, we believe the proper course is to vacate Adderley's sentence and remand the matter to the trial court once more for resentencing in accordance with the teaching of *Miller* and *Caballero*. (See *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1480-1482; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1013-1015.) Although the trial court considered Adderley's age and the remarks Adderley and his mother made at the original sentencing hearing, it did so without the benefit of *Miller*. We express no opinion as to how the trial court should weigh the factors discussed in *Miller* and *Caballero* or the term to be imposed.

This resolution renders the claim of ineffective assistance of counsel moot and the abuse of discretion claim premature. Also, the fact the trial court recited evidence from Manard's trial is harmless as the trial court gave Adderley the "benefit of the doubt that he may very well have *not* done the actual shooting." In any event, because the matter is being remanded, the parties and the trial court may revisit any factual issues.

---

[3]	The continued vitality of this presumption in light of *Miller* and *Caballero* is before the California Supreme Court in *People v. Moffett* (2012) 209 Cal.App.4th 1465, review granted Jan. 3, 2013, S206771; *People v. Gutierrez* (2012) 209 Cal.App.4th 646, review granted Jan. 3, 2013, S206365; *People v. Siacksorn* (2012) 211 Cal.App.4th 909, 914-916, review granted Mar. 20, 2013, S207973.)

10

## DISPOSITION

The sentence is vacated and the case is remanded for resentencing in accordance with the views expressed. In all other respects, the judgment is affirmed. The petition for writ of habeas corpus is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

11