Filed 4/19/16  P. v. Ross CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DARREN ROSS,<br><br>    Defendant and Appellant. | B260123<br><br>(Los Angeles County<br>Super. Ct. No. BA392767) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed as modified.

Kyle D. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Lance E. Winters, Senior Assistant Attorney General; Zee Rodriguez, Deputy Attorney General; Andrew S. Pruitt, Deputy Attorney General, for Plaintiff and Respondent.

_____

Appellant Darren Ross was convicted of robbery and assault with a stun gun. At sentencing, defense counsel informed the court that Ross wanted to make a statement of apology, and that two other witnesses wanted to provide testimony about his character. The court denied the requests, and sentenced Ross to the maximum permissible term of imprisonment.

Ross appeals his sentence, arguing that the court abused its discretion when it refused to allow him or his witnesses to speak at the sentencing hearing. We affirm the judgment as modified to correct an error in the calculation of Ross's presentence custody credits.

## FACTUAL BACKGROUND

On August 15, 2012, the district attorney for the County of Los Angeles filed an information charging appellant Darren Ross with one count of robbery (Pen. Code, § 211[1]), two counts of assault with a firearm (§245, subd. (a)(2)); one count of dissuading a witness by force or threat (§136.1, subd. (c)(1)); and one count of assault with a stun gun (§ 244.5, subd. (b)). The information alleged similar counts against two co-defendants, Mindhu Givens and Mark Cuevas.

### A. Trial Testimony and Verdict

Nicole Lynch-Coughlin testified that she had previously worked as a bookkeeper at three adult clubs named "The Gentlemen's Club," "Nicolas" and "Menage." On December 19, 2011, Lynch-Coughlin met with Michael Khorsandi, the owner of The Gentlemen's Club and Nicolas, to review the clubs' profit and loss statements. Lynch-Coughlin brought her four-month-old son and her sister, Brittany Hutchinson, to the meeting. Mark Cuevas, a former manager of Menage, was also present.

At some point during the meeting, Lynch-Coughlin saw Cuevas walk outside the office and begin talking to someone. Seconds later, Mindhu Givens entered the office wearing a ski mask and pointing a gun at Cuevas's head. A second man wearing a mask, later identified as appellant Ross, knocked Hutchinson to the floor, pointed a firearm at

---

[1]    Unless otherwise noted, all further statutory citations are to the Penal Code.

2

Lynch-Coughlin and ordered her to get on the ground. While Lynch-Coughlin was on the floor, she heard Givens order Khorsandi to hand over his money, cell phone and keys. Givens also threatened Khorsandi, telling him that he knew where Khorsandi lived and would kill him if he called the police. While Khorsandi was trying to locate his phone, Ross shot him with a taser three times. Ross and Givens then left the premises with Cuevas, who they released in the parking lot. Lynch-Coughlin was extremely upset about what had occurred and immediately fled with her sister and child. While driving on the freeway, Lynch-Coughlin became hysterical. She pulled to the side of the road to calm herself, and was eventually able to complete her drive home and call the police.

Brittany Hutchinson testified she had traveled to The Gentlemen's Club to help her sister take care of her nephew. Hutchinson saw Cuevas receive a phone call and leave the club office. Approximately 10 seconds later, Cuevas reentered the office with Givens, who was wearing a ski mask and pointing a gun at Cuevas's head. Hutchinson testified that Ross, who was also wearing a mask, then entered the office, pushed her to the ground and put a gun to her head. Givens asked Khorsandi for "the money" and his phone. Khorsandi was then shot with a taser "over and over." When Givens and Ross left, Hutchinson departed with her sister. Hutchinson stated that she and her sister had to pull off the freeway while driving home because they were both crying and vomiting.

Khorsandi testified that he drove to Nicolas every Monday morning to pick up cash that had been deposited in the club's safe during the prior week. Khorsandi would then transport the cash to The Gentlemen's Club, where he would complete his weekly accounting. Khorsandi stated that Cuevas used to work for him and was aware of his weekly routine.

Khorsandi stated that on Monday, December 19, 2011, he arrived at The Gentlemen's Club with a bag containing cash he had picked up from Nicolas. While reviewing his clubs' finances with Lynch-Coughlin, Khorsandi observed Cuevas leave the office, and then return with two masked men. One of the men, Givens, had his hand on Cuevas's neck and was holding a gun. Givens asked Khorsandi "where is the money?" Givens then saw the bag containing the cash deposits from Nicolas. Ross was

3

holding a gun and a taser; he shot Khorsandi with the taser three times, hitting his foot and back. The masked men then took the bag of money and fled.

Ross, testifying in his defense, stated that he had travelled to The Gentlemen's Club to collect money from Givens. According to Ross, he was initially told they were going to stage a robbery, and that the participants intended to file a fraudulent insurance claim. However, when Ross arrived at The Gentlemen's Club, Cuevas informed him the plan had changed, and that they were going to commit an actual robbery. Cuevas gave Ross and Givens a bag containing a ski mask, a taser and a replica of a handgun. Acting at the direction of Cuevas, Ross entered the club with a ski mask and the taser. Although Ross had only intended to serve as a "lookout," Cuevas ordered him to shoot Khorsandi with the taser. Ross claimed he shot the taser once, hitting Khorsandi in the foot.

Ross admitted he had participated in the robbery "on his own volition" and that he had intended to shoot Khorsandi. He also stated that he accepted "responsibility" for his actions, and that he was aware he had "terrified some people." Ross testified he had no prior felony convictions, and had been continuously employed for the last five years.

The jury found Ross guilty of second degree robbery (§§ 211; 212.5, subd. (c)) and assault with a stun gun (§ 244.5, subd. (b)); it found him not guilty of assault with a firearm (§ 245, subd. (a)(2)) and dissuading a witness by force or threat (§ 136.1, subd. (c)(1)).

### B. Sentencing

Prior to sentencing, the trial court received a report from the probation office stating that Ross had three prior misdemeanor convictions for driving-related offenses and public intoxication. The report recommended the court sentence Ross to state imprisonment, and that it select the high term based on the following aggravating circumstances: (1) the crime involved great violence, bodily harm or other acts disclosing a high degree of cruelty, viciousness or callousness; (2) the crime involved planning and sophistication; (3) the defendant's convictions appeared to be increasing in

4

seriousness. (See Cal. Rules of Court, rule 4.421(a)(1), (a)(8) and (b)(2).) The probation office identified no mitigating circumstances.

At the hearing, the court announced its tentative decision was to impose the maximum permissible term of imprisonment, which consisted of the high term of five years on the principal offense of robbery, and a consecutive sentence of eight months (one-third the midterm of two years) on the subordinate offense of assault with a stun gun. The court explained that it believed the "high term" on the robbery count was appropriate because the crime had "involved . . . planning and sophistication, and the defendant wore a mask. . . . To me this is a rather egregious robbery and put the lives of three persons into danger and left an indelible mark on the two women involved." The court further explained that it believed a consecutive sentence on the subordinate offense was warranted because Ross's use of the taser had been "gratuitous to the crime of robbery," suggesting he "was just trying to inflict pain on the victim."

Defense counsel argued the court should impose a lower sentence based on Ross's minimal prior criminal record and his continuous employment over the prior five-year period. Counsel requested that Ross be permitted to "address the court" to apologize for his actions, and to demonstrate that he "underst[ood] the damage . . . he [had] done." Counsel also requested that Ross's girlfriend and his girlfriend's mother be permitted to "testify to what kind of person he's been, how he's been in the community, how he's been responsible, how he's been working."

The court denied Ross's request to speak, explaining that the victims were not present to hear an apology, and that the court did not "care to hear that [Ross was] sorry" given the "outrageous" nature of his criminal conduct. The court also refused to allow Ross's girlfriend and her mother to speak, stating that it did "not hear from family members of the defendant at sentencing matters."

In response, defense counsel asked the court to reschedule sentencing so that he could submit a sentencing memorandum that included statements from Ross's witnesses. Counsel asserted that he had intended to submit a written memorandum prior to the

5

hearing, but had been unable to reach his client.  The court denied the request, explaining that it had already granted Ross a six-week delay in sentencing.

The court then announced that it was adopting its tentative sentence:  "[T]his was a terrible crime.  He didn't have to do it.  And he planned it and he went along.  It had a remarkable impact on the victims.  I think he is very fortunate that . . . the case . . . did not result in more convictions and more exposure for him.  But I do find that the crime involved planning, sophistication. . . . This was an impetuous act and I think that the high term is appropriate.  So the high term on count one is imposed.  That's five years.  I find as a mitigating circumstance, I did consider the fact that he has a minimal criminal history, . . . [but] people have to pay for their mistakes.  I do think a consecutive sentence is appropriate for . . . use of ta[s]er [sic].  It's clear there was more than just a robbery going on.  [Ross] was deliberately inflicting pain on the victim and I thought that was outrageous.  So a consecutive sentence of one-third the midterm of two years is imposed. . . . The total sentence imposed today is five years, eight months."

## DISCUSSION

### A. *The Court Did Not Abuse its Discretion in  Refusing to Allow Ross or his Witnesses to Speak at the Sentencing Hearing*

On appeal, Ross argues we should vacate his sentence based on the trial court's refusal to allow him or his witnesses to speak at the sentencing hearing.  Citing Penal Code section 1204, Ross contends the court's ruling violated his statutory right to present evidence in mitigation of his sentence.

#### 1. *Summary of California's determinate sentencing scheme*

Under California's Determinate Sentencing Act (§ 1170 et seq.), the trial judge is provided "discretion in selecting a term within a statutory range."  (*People v. Wilson* (2008) 164 Cal.App.4th 988, 992; see also § 1170, subd. (b) ["the choice of the appropriate term shall rest within the sound discretion of the court"].)  "Where imprisonment is imposed, the court typically selects a lower, middle, or upper term as the base term for the underlying offense.  [Citation.]. . . . In cases involving multiple

6

convictions, terms of imprisonment either can or must be made consecutive. . . . [¶] Although many of the act's provisions are mandatory, the trial court often has broad discretion to tailor the sentence to the particular case. The choices available commonly include the decision to order probation rather than imprisonment, to impose the lower or upper term instead of the middle term of imprisonment, to impose consecutive rather than concurrent sentences under certain discretionary provisions, and to strike or stay certain enhancements." (*People v. Scott* (1994) 9 Cal.4th 331, 349 (*Scott*).)

As directed by the Legislature, the Judicial Council has promulgated rules to guide the trial court's exercise of discretion in selecting an appropriate sentence. (See § 1170, subd. (a)(3); § 1170.3; *Scott, supra*, 9 Cal.4th at p. 349; Cal. Rules of Court, rules 4.420, 4.421, 4.423 & 4.437.) These rules provide that when selecting among the lower, middle and upper terms, the sentencing judge must consider the "circumstances in aggravation" listed in rule 4.421, and the "circumstances in mitigation" in rule 4.423. (See Cal. Rules of Court, rules 4.420 & 4.409 ["Relevant criteria enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise"].) The court also has discretion to consider any "additional criteria [that are] reasonably related to the decision being made. Any such additional criteria must be stated on the record by the sentencing judge." (Cal. Rules of Court, rule 4.408.)

The parties and any victim of the crime are permitted to "submit a statement in aggravation or mitigation." (§ 1170, subd. (b).) Rule 4.437 requires that the statement be filed "at least four days before the time set for sentencing," and include the following: "(1) A summary of facts that the party relies on as circumstances justifying the imposition of a particular term; . . . (2) Notice of intention to . . . offer evidence in . . . mitigation at the sentencing hearing"; and (3) a description of "the evidence to be offered, including a description of any documents and the names and expected substance of the testimony of any witnesses." (Cal. Rules of Court, rule 4.437(a) & (c).) Rule 4.437 further provides that a party may not introduce any "evidence in aggravation or mitigation . . . at the sentencing hearing unless it was described in the statement, or unless

7

its admission is permitted by the sentencing judge in the interests of justice." (*Id*. at rule 4.437(c).)

Section 1204 separately provides that "[t]he circumstances [in aggravation or mitigation] shall be presented by the testimony of witnesses examined in open court. . . . No affidavit or testimony, or representation of any kind . . . can be offered to or received by the court . . . in aggravation or mitigation of the punishment, except as provided in this . . . section. This section shall not be construed to prohibit the filing of a written report by a defendant or defendant's counsel on behalf of a defendant if such a report presents a study of his background and personality and suggests a rehabilitation program."

When choosing a sentence, the court is permitted to consider "the record in the case, the probation officer's report, . . . statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim . . . and any further evidence introduced at the sentencing hearing." (§ 1170, subd. (b); see also Cal. Rules of Court, rule 4.420(b).)

### 2. *The trial court did not abuse its discretion in excluding the witness statements*

Ross contends the trial court violated his statutory rights under section 1204 by refusing to allow him or his two witnesses to speak at the sentencing hearing. As Ross correctly notes, our Supreme Court has held that section 1204 provides a defendant "'the right to call witnesses, including himself,' to testify" at the sentencing hearing about any mitigating circumstances. (*People v. Evans* (2008) 44 Cal.4th 590, 598 (*Evans*); see also *People v. Murray* (2012) 203 Cal.App.4th 277, 290 (*Murray*) [section 1204 "allows a defendant to call witnesses to testify at the sentencing hearing about any mitigating circumstances"] [disapproved on other grounds in *People v. Gutierrez* (2014) 58 Cal.4th 1354].) This statutory right is, however, subject to certain limitations that are relevant here.

8

First, rule 4.437 imposes various procedural requirements on a defendant's right to call witnesses. As summarized above, the rule requires any party who intends to present evidence at the hearing to file and serve a statement notifying the other parties of "the expected substance" of each witness's testimony. (Cal. Rules of Court, rule 4.437(c)(2).) The rule further provides that "[n]o evidence in aggravation or mitigation may be introduced at the sentencing hearing unless it was described in the statement, or unless its admission is permitted by the sentencing judge in the interests of justice." (*Ibid*.) Here, defense counsel did not file a statement in mitigation, nor did he argue that the trial court should nonetheless permit the witnesses to testify "in the interests of justice." The parties' appellate briefs do not address rule 4.437, which would appear to preclude defendant's section 1204 claim.

Second, even when a party has complied with the procedural requirements of rule 4.437, the trial court retains "great discretion to exclude evidence [at sentencing] that would 'necessitate undue consumption of time' [citation]. Thus, the court may refuse to hear evidence pertaining to peripherally relevant matters that will not affect the court's exercise of its sentencing discretion, or testimony that merely restates information" the court has already been provided. (*Evans, supra*, 44 Cal.4th at p. 599.)

Based on the record before us, we find no basis to conclude the court abused its discretion in declining to hear the testimony of Ross or his witnesses. In regard to Ross's testimony, defense counsel informed the court that the defendant wanted to apologize to the victims, and demonstrate he was "sincere in understanding the harm he had caused." The court explained that the testimony was unnecessary because the victims were not present to hear his apology, and because Ross's acknowledgment of wrongdoing would not affect the court's sentencing decision given the "outrageous" nature of his conduct. The court noted that the evidence showed the robbery had involved planning and sophistication (see Cal. Rules of Court, rule 4.421(a)(8)), that Ross had placed several people at risk of harm; and that the victims suffered substantial trauma. The trial court could reasonably conclude, in light of these aggravating circumstances, it was immaterial

9

whether Ross understood the gravity of his offense, which is not relevant to any of the circumstances in mitigation listed under rule 4.423.

Defense counsel also orally described the information Ross's girlfriend and her mother intended to provide, explaining that they wanted to speak about "what kind of person he's been," his involvement in the community and his employment history. Ross has provided no argument explaining why the court had a duty to hear this character evidence, which again has no relevance to any of the circumstances in mitigation listed in rule 4.423. Moreover, the trial court had already heard evidence regarding Ross's minimal prior criminal record and his employment history, which were topics the defendant discussed during his trial testimony. The court acted within its discretion in concluding that any further evidence regarding his character was immaterial to its sentencing decision.

Ross contends, however, that the trial court's decision to exclude the testimony of his character witnesses was not a discretionary act, but rather was based on an unlawful rule prohibiting family members from speaking at sentencing. When the court was informed of the subject matters that Ross's girlfriend and her mother intended to speak about, the court stated: "I don't hear from family members of the defendant at sentencing matters." Ross asserts this is a categorical prohibition on family member testimony that constitutes a violation of the right to call witnesses set forth in section 1204.

Ross did not raise this argument in the trial court. After the court declined to hear from Ross's witnesses, defense counsel requested an opportunity to submit "written materials" that included statements from Ross's witnesses. Counsel never asserted that section 1204 provided Ross a right to present his witness's testimony in open court, nor did counsel argue that the court's purported rule against family member testimony violated the statute.

Generally, we do not consider points raised for the first time on appeal. (*In re Michael L.* (1985) 39 Cal.3d 81, 87 ["Objections not presented to the trial court cannot be raised for the first time on appeal"]; *In re Abdirahman S.* (1997) 58 Cal.App.4th 963, 971 ["the time to object is at the pertinent hearing, not for the first time on appeal"].) Our

10

courts have applied this forfeiture rule to arguments challenging the exclusion of evidence (see *People v. Champion* (1995) 9 Cal.4th 879, 919 [overruled on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860]), and "issues concerning the manner in which [a] sentenc[ing] . . . hearing [was] conducted." (See *Scott, supra*, 9 Cal.4th at pp. 351-353; *People v. Smith* (2001) 24 Cal.4th 849, 852 ["all 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' raised for the first time on appeal are not subject to review"].) The purpose of the rule is "to bring errors to the attention of the trial court so they may be corrected or avoided." (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468.) Had defense counsel objected to the court's stated reason for declining to hear Ross's witnesses, the court would have had an opportunity to clarify its position or correct any error. Ross has presented no argument why it would be fair or proper to address a claim he never presented to the trial court. (See *ibid.* [forfeiture rule "is founded on considerations of fairness to the court and the opposing party, and on the practical need for an orderly and efficient administration of the law"].)[2]

### B. *The Judgment Shall Be Modified to State the Correct Number of Custody Credits*

Ross also argues the trial court miscalculated his number of custody credits. The Attorney General agrees, asserting that the record shows Ross was entitled to 403 days of

---

[2] The Attorney General also argues the court was not compelled to hear from Ross or his witnesses because they did not offer sworn testimony. Our Supreme Court has clarified that section 1204 only establishes a right to present testimony that is "provided under oath" (*Evans, supra,* 44 Cal.4th at p. 599); the statute does not extend to unsworn testimony. (*Ibid.*; see also *Murray, supra,* 203 Cal.App.4th at p. 290.) In this case, defense counsel stated that the defendant wanted to "address the court," and that his girlfriend and his girlfriend's mother wanted to "testify" about his character and his employment history. The Attorney General contends these statements were insufficient to demonstrate the witnesses were prepared to testify under oath. (See *Murray, supra*, 203 Cal.App.4th at p. 290 [section 1204 inapplicable where defendant requested that "two witnesses be allowed to address the court"].) We need not address this argument, having concluded the trial court's ruling was proper on other grounds.

credit for time spent in custody, but only received 376 days of credit.[3]  The Attorney General further contends that because of this error, Ross's worktime credits should also be increased from 56 days to 60 days.  (See § 2933.1 [person convicted of violent felony may "accrue no more than 15 percent of worktime credit"].)  Having reviewed the record, we agree with the parties, and order the judgment modified to reflect that Ross is entitled to 403 days of actual custody credits, and 60 days of worktime credit.

## DISPOSITION

The judgment is modified to reflect that Ross shall receive 463 days of presentence credits, consisting of 403 days of actual custody credits and 60 days of worktime credit.  The trial court is directed to issue a new abstract of judgment reflecting the proper number of credits, and to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.

ZELON, J.

We concur:


PERLUSS, P. J.


BLUMENFELD, J.[*]

---

[3]    In support, the Attorney General cites statements in the record indicating Ross was arrested on January 11, 2012, and then released on bond on February 16, 2013.  These dates correspond to 403 days in actual custody credits, rather than the 376 days the trial court credited.

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.